**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
RUTHANN C. CALLAHAN,

                       Plaintiff,

         - against -

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

                     Defendant.
-------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 17-4920 (JS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    <u>PRELIMINARY STATEMENT</u>

      On August 21, 2017, Plaintiff Ruthann C. Callahan (the "Plaintiff" or "Claimant")

commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g) *et*

*seq.*, against Defendant Nancy A. Berryhill, in her capacity as Acting Commissioner of the

Social Security Administration (the "Defendant" or "Commissioner"). *See generally* Complaint

("Compl.") [DE 1]. Specifically, Plaintiff challenges the final administrative decision which

denied her claim seeking disability benefits. *See generally id.* On September 28, 2018, Plaintiff

and Defendant filed cross-motions pursuant to Federal Rule of Civil Procedure 12(c) for

judgment on the pleadings. Plaintiff's Notice of Motion for Judgment on the Pleadings [DE 15];

Defendant's Notice of Cross-Motion [DE 17].

      The Honorable Arthur D. Spatt,[1] who was then assigned to this case, referred the parties'

cross-motions to this Court for a Report and Recommendation as to whether either motion

---

    [1]      Judge Spatt presided over this matter up until his untimely death, after which this
case was reassigned to the Honorable Joanna Seybert.

should be granted, and if so, what relief should be ordered. DE 22. For the reasons which follow, the Court respectfully recommends to Judge Seybert that: (1) Plaintiff's motion for judgment on the pleadings be GRANTED; (2) Defendant's motion for judgment on the pleadings be DENIED; and (3) the case be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed an application for Social Security disability insurance benefits ("DIB") on June 10, 2014. *See* Administrative Transcript ("Tr.") [DE 20] at 65, 132-35. In her application, Plaintiff stated she ceased working on June 1, 2011 due to her medical conditions. *Id.* at 145. Plaintiff listed ten separate medical conditions which limited her ability to work: lumbar spine impairment, irritable bowel syndrome ("IBS"), coronary artery disease, brittle diabetes impairment, anxiety, sleep apnea, right shoulder impairment, left wrist impairment, multiple joint arthritis, and cervical spine impairment. *Id.* at 144. After conducting an initial review, the Social Security Administration ("SSA") denied Plaintiff's application for DIB on September 15, 2014. *Id.* 54-74. On October 14, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 75-76. A hearing was conducted on November 9, 2016 before Alan B. Berkowitz, the presiding ALJ. *Id.* at 26-53. On December 12, 2016, ALJ Berkowitz issued his findings of fact and conclusions of law and ultimately determined that Plaintiff was not disabled. *Id.* at 10-21. Plaintiff requested that the Commissioner's Appeals Council review the ALJ's decision. However, the Appeals Council denied Plaintiff's application in an Order dated June 19, 2017. *Id.* at 1-5. As such, the ALJ's decision became the "final decision" of the Commissioner. *Id.* at 1.

Plaintiff commenced the instant action on August 21, 2017 seeking judicial review of the Commissioner's final decision pursuant to Section 205(g) of the SSA, as amended, 42 U.S.C. § 405(g). Compl. ¶ 1. On September 28, 2018, the parties filed their cross-motions seeking judgment on the pleadings, which Judge Spatt referred to this Court for a Report and Recommendation as to whether either motion should be granted.

**B.    The Non-Medical Evidence**

**1.    *The November 9, 2016 Administrative Hearing***

**a.    Plaintiff's Testimony**

Plaintiff testified that she is 57 years old and a high school graduate. Tr. at 29. She lives in a single-story home in Blue Point, New York. *Id.* at 29-30. Plaintiff is 5 feet and 4 inches tall and weighs about 165 pounds. *Id.* at 29. She previously worked at Stonybrook Hospital (the "Hospital") and Brookhaven National Lab (the "Lab"). *Id.* At the Hospital, Plaintiff worked on a hospital floor. *Id.* No further details pertaining to Plaintiff's employment at the Hospital were elicited during her testimony. During the time Plaintiff was an administrative assistant at the Lab, she would spend approximately two hours typing, answering phones and preparing reports. *Id.* at 32. Due to contractors working at the facility, the remainder of Plaintiff's day included "a lot of walking around, [and] delivering/picking up information from . . . other building sites." *Id.* Plaintiff also stated that her job description encompassed payroll invoicing for all of the contractors, ensuring that the contractors were "up to date on all of their risk management" protocols, and attending classes to speak with the contractors about what they can and cannot do in certain buildings. *Id.* at 33. Her responsibilities also forced her to pull files from different buildings within the Lab. *Id.* at 33-34. Plaintiff's employment with the Lab was terminated in June 2011 because the Lab was demolished. *Id.* at 34. She has not worked since then. *Id.* at 30.

Plaintiff suffers from anxiety and she used to see a psychiatrist but no longer does. *Id.* at 34. However, she takes Zoloft and Xanax which are prescribed by her general practitioner and these drugs help her. *Id.* at 34-35. Plaintiff typically has headaches caused by her neck problems as well as pain in her right hand, right shoulder, right foot, and lower back. *Id.* at 35. She has degenerative disc disease, arthritis, and sciatica on her right side. *Id.* Although she visited an acupuncturist, the acupuncturist was unable to help her. *Id.* at 36. Plaintiff receives Toradol shots in her back from her general practitioner. *Id.* at 35. She also takes hydrocodone-acetaminophen for pain which makes her sleepy and at night she takes carisoprodol (a muscle relaxer) for spasms. *Id.* at 39-40. Going up and down stairs is difficult due to the pain in her neck, hands, right arm and lower back. *Id.* at 30. She does not typically drive. *Id.* At home, Plaintiff folds clothes and watches television. *Id.* at 38-39. She has difficulty sitting in a chair and can only sit or stand for 15-minute intervals. *Id.* at 36-37. She gets distracted while watching television due to pain she experiences from sitting down. *Id.* at 39. The Court also notes that Plaintiff requested to stand while giving her testimony at the administrative hearing. *Id.* at 36.

Because of arthritis flare-ups, Plaintiff has difficulty raising her arms and reaching. *Id.* at 37. She also has daily difficulties using her hands, making a fist, and opening and closing her hand. *Id.* at 37, 45-46. She is unable to lift more than 20 pounds and sometimes has difficulty picking up a gallon of milk. *Id.* at 45, 48. Plaintiff is diabetic and her fingers and toes turn numb from a combination of her medical conditions. *Id.* at 42. She is not currently receiving treatment from an orthopedist for her hands, neck, or other body parts because she cannot afford it through her insurance, which is provided through her husband's employer. *Id.* at 42-43. She does have a back brace which she does not wear and she does not use a cane to walk. *See id.* at 40-41.

4

Plaintiff has IBS which causes her not to have much of an appetite and "running to the bathroom issues." *Id.* at 43. When she was 39 years old, she had a quadruple bypass after having a heart attack. *Id.* at 44. As a result, Plaintiff experiences shortness of breath and feels as if she is going to pass out when she walks too much. *Id.* at 44-45. She is only able to walk about half a block at a time. *Id.* at 45.

###### b.    Vocational Expert's Testimony

During the hearing, the ALJ also took testimony from a Vocational Expert, Mr. Linder. *See id.* at 48-53. In accordance with the Dictionary of Occupational Titles ("DOT"), Plaintiff's previous jobs were classified as a unit clerk with a light exertion level and a secretary with a light exertion level based on the amount of walking she did. *Id.* at 49-50. Then, the ALJ posed the following scenario:

> And I'd like you to assume [an] individual [with] the same age, educational background, work history, and the same transferable skills, if there are any. And if there are, please tell me that. With the same work history. Assume that the hypothetical individual can lift up to 20 pounds; can sit for a total of six hours per day; can stand for a total of two hours per day. In the sitting, would have to take, every 30 minutes, a two-minute break. Could do no more than occasionally bending; no more than occasional postural, stooping, crouching, crawling, kneeling, squatting, and climbing.
>
> Occasionally reaching overhead; no dangerous heights; no dangerous machinery. Can do both, simply and complex; can frequently interact, general public, co-workers, and supervisors. Can such a person do past work?

*Id.* at 51. The Vocational Expert then considered the hypothetical posed by the ALJ and stated that Plaintiff could perform her secretary job per the DOT description, but not per Plaintiff's own description. *Id.* The ALJ then supplemented his hypothetical: "And I'm adding into the hypothetical she could only occasionally handle and finger with the dominant [hand]. Could she do past work or any work?" *Id.* The Vocational Expert then testified that if an individual were

only able to occasionally handle and finger, they would not be able to be a secretary or other work, as all jobs would be "knock[ed] out."  *Id.* at 51-52.

### C.    The Medical Evidence

#### 1.    *Medical Evidence Preceding Plaintiff's June 10, 2014 SSI Application Date*

Plaintiff's medical treatment records reveal that she sought treatment from Sanford A. Ratzman, M.D., an orthopedic surgeon, as early as August 1, 2011.  *Id.* at 342, 362.  On that date, Dr. Ratzman noted that Plaintiff's left shoulder showed "calcification subacromially and greater tuberosity with hypertrophic changes at the AC joint and inferior spurring."  *Id.* at 342. During a September 12, 2011 exam, Plaintiff told Dr. Ratzman she was experiencing persistent symptoms, particularly cervical radiculitis left into the upper extremity and slight tenderness along the lateral epicondyle, but she had good range of motion of her elbow.  *Id.* at 348.  Dr. Ratzman stated Plaintiff's symptoms were consistent with rotator tendinitis or a possible tear and he ordered cervical and left shoulder MRIs.  *Id.*  He also wanted Plaintiff to continue therapy.  *Id.* The radiologist's report for Plaintiff's cervical spine MRI revealed left-sided degenerative facet hypertrophy at C4-C5 and C5-C6, a bulging disc at C6-C7, and degenerative disc disease from C1 to T1.  *Id.* at 340.  There was no evidence of a herniated disc or spinal canal stenosis.  *Id.*  On September 27, 2011, Dr. Ratzman discussed Plaintiff's cervical spine MRI results with her and advised that she had degenerative disc disease and facet changes but no HNP or stenosis.  *Id.* at 348.  Since Plaintiff's left shoulder MRIs were not available, Dr. Ratzman advised her that when they were, he would discuss pain management for her spine and further treatment regarding her shoulder.  *Id.*

Plaintiff did not see Dr. Ratzman again until more than one year later on November 8, 2012.  *Id.* at 349.  She described recurrent symptoms in her left shoulder despite therapy and

Dr. Ratzman noted that the MRIs from the prior year showed bicipital tendinitis, impingement and calcific tendinitis.  *Id.*  Plaintiff had a shoulder x-ray which was unavailable for Dr. Ratzman to review and showed AC joint change.  *Id.*  Plaintiff had cervical spine x-rays which showed some straightening and an MRI which reflected some bulging at C6-7 and osteophytes without HNP.  *Id.*  In addition, Plaintiff also presented with new pain in her left wrist resulting from bilateral mild carpal tunnel syndrome and cervical radiculopathy for which Dr. Ratzman gave her a Depo-Medrol injection.  *Id.* at 343, 349-50.  She had been taking low dose aspirin.  *Id.* at 349.  Dr. Ratzman examined Plaintiff again on November 30, 2012 and Plaintiff again complained of pain in her left shoulder.  *Id.* at 350.  Dr. Ratzman administered a Depo-Medrol injection to her shoulder and stated if the shoulder did not improve, she would need to decide if she wanted to undergo a possible surgical procedure.  *Id.*  Dr. Ratzman also noted that Plaintiff's left wrist did well following the injection he gave her during the November 8, 2012 visit.  *Id.*  Plaintiff next saw Dr. Ratzman on January 25, 2013 and still complained of pain in her left wrist "around the de Quervain's."  *Id.*  Otherwise, Plaintiff's wrist motion was intact and she would be seeing Dr. Ratzman for another injection.  *Id.*  Dr. Ratzman administered another Depo-Medrol shot into Plaintiff's left shoulder.  *Id.*  He noted that Plaintiff had been symptomatic for two years.  *Id.* at 359.

On February 2, 2013, Plaintiff underwent arthroscopic surgery of her left shoulder which was performed by Dr. Ratzman.  *Id.* at 335-37.  The following procedures were performed:

- Partial synovectomy
- Debridement and Topaz micro thermal repair of Bankart and superior labrum anterior and posterior labral lesion
- Debridement of articular side, partial rotator tear
- Subacromial bursectomy and acrimioplasty
- Partial Mumford procedure
- Debridement of partial rotator tear
- Topaz micro thermal rotator repair
- Application of Cryo/Cuff

*Id.* at 335.  Plaintiff tolerated the procedure well.  *Id.* at 337.  She saw Dr. Ratzman twice in February 2013 for post-operative follow ups.  During the first visit on February 14, Dr. Ratzman noted Plaintiff was healing well and had minimal swelling.  *Id.* at 351.  Then, during the second visit on February 22, Dr. Ratzman stated Plaintiff's wounds were healed, that she would only use a sling as necessary, and that she would start therapy.  *Id.*  Dr. Ratzman also examined Plaintiff's left wrist again and stated she had marked tenderness with marked restricted motion.  *Id.*  As such, Plaintiff was given another Depo-Medrol injection into her wrist and told to take anti-inflammatories and use ice and heat as necessary.  *Id.*  A third post-operative visit was held on March 25, 2013 and Dr. Ratzman noted Plaintiff's wrist had done well since the last injection. *Id.* at 358.  As to her left shoulder, Plaintiff's range of motion was good and she was exercising on her own.  *Id.*

On August 22, 2013, Plaintiff saw Dr. Ratzman and her left wrist was giving her recurrent de Quervain's tenosynovitis.  *Id.* at 352.  By this time, Plaintiff had "a good six to seven months of relief with injection" and was administered another injection.  *Id.*  Plaintiff also complained of cervical spine pain, which was not relieved with exercise, anti-inflammatories, or rest, and would need to undergo another MRI.  *Id.*  Plaintiff's left shoulder was "excellent and she . . . had good ROM without difficulty."  *Id.*  Another MRI of Plaintiff's cervical spine was performed on August 27, 2013 which showed straightening of the mid and upper cervical spine likely related to muscular spasm, a small herniated disc at C6-C7, left sided facet arthropathy at C4-C5 and C5-C6, degenerative disc disease from C2 to T1, and small hemangiomas in some of the cervical vertebral bodies.  *Id.* at 332.  Dr. Ratzman reviewed the cervical spine MRI findings with Plaintiff on September 9, 2013 and advised her that she was a candidate for pain

management. *Id.* at 357. Plaintiff also complained of wrist pain and Dr. Ratzman said he would discuss surgery with her in a follow-up visit. *Id.*

Plaintiff saw Dr. Ratzman five months later on February 24, 2014. *Id.* Although Plaintiff had no history of trauma regarding her right shoulder, she had been experiencing pain for two months. *Id.* Dr. Ratzman gave her another Depo-Medrol injection. *Id.* at 353. Dr. Ratzman also reviewed Plaintiff's x-ray from December 30, 2013 which demonstrated some calcification subacromially along with some mild AC joint narrowing and inferior spurring. *Id.* On March 27, 2014, Plaintiff complained of "derangement [in her] right wrist with a feeling of cracking and pain." *Id.* at 356. The shoulder injection from February 24, 2014 provided Plaintiff with only temporary relief. *Id.* Plaintiff then had a right shoulder MRI on April 2, 2014. *Id.* at 339. This MRI revealed mild to moderate supraspinatus and infraspinatus tendinopathy with mild calcium hydroxyapatite deposition compatible with calcific tendinosis, moderate subscapularis tendinopathy with small superimposed low-grade articular surface tear, mild to moderate bicipital tendinosis with moderate tenosynovitis, and mild hypertrophic acromioclavicular joint degeneration. *Id.* On April 3, 2014, in a phone call, Dr. Ratzman discussed this MRI with Plaintiff and told her she had partial rotator cuff tears and impingement. *Id.* at 354. On April 25, 2014, Plaintiff's right wrist was giving her difficulty at the "metacarpocarpal" and x-rays were taken that day. *Id.* The x-rays showed very mild degenerative changes intercarpal about the first metacarpal and that the metacarpals were intact with some mild spurring proximally without lytic or destructive lesions. *Id.* at 346, 354. Dr. Ratzman recommended repairs be made to Plaintiff's right shoulder and left wrist. *Id.* at 354.

On June 4, 2014, x-rays were taken of Plaintiff's thoracic and lumbar spine. *Id.* at 328-39. As to the thoracic spine, the x-rays showed mild thoracolumbar levoscoliosis with moderate

multilevel spondylosis. *Id.* at 328. As to the lumbar spine, the x-rays revealed mild lumbar

dextroscoliosis with mild multilevel degenerative disc disease, anterolisthesis of L4 on L5, and

hypertrophic degeneration of the lower lumbar facet joints. *Id.* at 329.

### 2. *Medical Evidence Subsequent to Plaintiff's June 10, 2014 SSI Application Date*

#### a. Dr. Ratzman

On June 12, 2014, Plaintiff saw Dr. Ratzman and described back pain and increased

pain in her left wrist. *Id.* at 355. Dr. Ratzman gave Plaintiff another injection into her wrist,

referred her for a lumbar MRI, and deferred possible right shoulder surgery. *Id.* Dr. Ratzman

also noted that Plaintiff was being followed by Dr. William Torelli, M.D., Plaintiff's family

practitioner, who would be giving her any medical clearance for possible surgery. *Id.* The

lumbar spine MRI was performed on June 16, 2014 and revealed discrete anterolisthesis of L4-

L5 associated with bilateral facet disease, degenerative disc disease from T11-S1 with chronic

reactive change of the endplates at T11-T12, a small area of bone marrow edema of the anterior

aspect of the body of T12 to the right of the midline, lumbar spine scoliosis, with no evidence of

herniated disc or spinal canal stenosis. *Id.* at 338. Dr. Ratzman discussed this MRI with Plaintiff

on June 19, 2014 and referred her to pain management. *Id.* at 334. Dr. Ratzman also advised

Plaintiff that she could have a shoulder procedure whenever she was ready. *Id.* The record does

not show that this shoulder procedure ever occurred. An additional MRI of Plaintiff's lumbar

spine was performed on June 29, 2015, the results of which were largely unchanged from the

prior scan. *Id.* at 411. Likewise, another x-ray was performed of Plaintiff's thoracic spine on

June 27, 2015 which appeared similar to the June 5, 2015 scan. *Id.* at 412.

### b. South Shore Family Practice: Dr. Torelli and John Palermo, RPA-C

For reasons unbeknown to the Court, although Plaintiff apparently began seeking treatment from Dr. Torelli at South Shore Family Practice as early as February 2000, the earliest treatment note in the record is dated October 18, 2014. *Id.* at 363, 399. However, prior to that date, Dr. Torelli completed an "Impairment Questionnaire" on Plaintiff's behalf on September 17, 2014. *Id.* at 363-68. Dr. Torelli diagnosed coronary artery disease, diabetes mellitus, obstructive sleep apnea, herniated nucleus pulposus in the lumbar and cervical spine, degenerative joint disease, hypertension, gastro esophageal reflux disease, depression, and generalized anxiety disorder. *Id.* at 363; *see* Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mem.") [DE 16] at 4; Memorandum of Law in Support of the Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def.'s Mem.") [DE 18] at 6-7. He opined that Plaintiff was limited to sitting, standing, and/or walking for one hour each throughout an 8-hour work day, 5 days per week, and occasionally lifting and/or carrying up to 20 pounds. Tr. at 365. Dr. Torelli further opined that Plaintiff must get up from a seated position to move around every 30 to 60 minutes, and would need 10 minutes before returning to a seated position. *Id.* These same parameters were provided when the Impairment Questionnaire asked Dr. Torelli to state how often Plaintiff would need to take unscheduled breaks. *See id.* at 366. Dr. Torelli stated that Plaintiff would need to take breaks every 30 to 60 minutes and would need to rest for 10 minutes before returning to work. *Id.* He also noted that Plaintiff had no significant limitations in reaching, handling, or fingering and could frequently grasp, turn and twist objects, use her hands for fine manipulations, and use her arms for reaching. *Id.* at 366. In addition, Dr. Torelli stated it was unlikely Plaintiff's symptoms would increase if she were placed in a

competitive work environment and that it would be rare for her symptoms to interfere with her attention and concentration. *Id.* Dr. Torelli believed Plaintiff would be absent as a result of her impairments and/or treatment less than once a month. *Id.* at 367. Moreover, Dr. Torelli did not believe any emotional factors contributed to Plaintiff's symptoms and limitations. *Id.*

On October 18, 2014, Plaintiff saw Dr. Torelli to have medication refilled and to have blood work done. *Id.* at 399. Otherwise, this treatment note is difficult to decipher. On January 7, 2015, Plaintiff again went to Dr. Torelli's practice for prescription refills and bloodwork, but it is not clear who treated her that day nor what the provider's impressions were. *See id.* at 398. However, the note from that day does state that Plaintiff was traveling to Florida for a few weeks. *Id.* The next day, someone reviewed Plaintiff's bloodwork with her. *Id.* at 397. Again, it is not clear what the findings were. Five months later, on May 26, 2015, Plaintiff saw John Palermo RPA-C at South Shore Family Practice because she was experiencing shooting pain in her back and legs following a road trip to Boston. *Id.* at 396. On June 8, 2015, Plaintiff went back to Physician Assistant ("PA") Palermo for bloodwork and a prescription refill. *Id.* at 395. Plaintiff saw PA Palermo again on June 23, 2015 because she was experiencing back pain after attempting to start her lawn mower. *Id.* at 394. Palermo's note from this date is otherwise difficult to read. The next note is from July 30, 2015, at which time PA Palermo saw Plaintiff for back pain and a shoulder injury "while trying to catch a friend falling off a bed." *Id.* at 393. Plaintiff next visited with PA Palermo on September 25, 2015 because she was experiencing congestion, dizziness, possible vertigo, and discomfort in her ears. *Id.* at 392.

A couple of weeks later, on October 5, 2015, it appears Plaintiff saw both Dr. Torelli and PA Palermo following a fall in her attic on October 2, 2015. *Id.* at 391. When she fell, Plaintiff landed on her back and her foot went through the ceiling. *Id.* She was prescribed medication for

back pain and Xanax for anxiety.  *Id.*  On October 15, 2015, Plaintiff had an MRI of her lumbar spine.  *Id.* at 463.  The radiologist's study of that MRI showed no herniation, but there was discrete anterior subluxation at L4-L5 associated with bilateral facet disease, bulging disc at L3-4, degenerative disc disease from T11-S1 with annular fissure at L5-S1, chronic reactive change of the endplates at T11-T12, and focal area fluid collection located in the right posterior subcutaneous region at the level of L5 and upper sacrum."  *Id.*  After this fall, Plaintiff also had an x-ray taken of her cervical spine which showed no significant interval change, "minimal anterolisthesis of C4 on C5," straightening of cervical lordosis which may be positional related to muscle spasm, mild degenerative disc disease at C4-5 and C6-7, mild multilevel spondylosis with hypertrophic facet joint degeneration, and no fractures.  *Id.* at 400.  The record does not reflect who reviewed this MRI with Plaintiff, but based on the MRI report, PA Palermo ordered the scan.  *See id.* at 463.

On October 22, 2015, Dr. Torelli also completed a "Disability Impairment Questionnaire" for Plaintiff.  *Id.* at 385-89.  In this questionnaire, Dr. Torelli stated that Plaintiff was experiencing back and hip pain, which he expected to last at least one year.  *Id.* at 385.  In an 8-hour workday, he opined that Plaintiff could perform a job in a seated position for less than one hour and likewise stand and/or walk for less than one hour per work day.  *Id.* at 387.  Dr. Torelli believed it was medically necessary for Plaintiff to avoid continuous sitting in an 8-hour workday, to get up from a seated position every 30 minutes and rest for 20 minutes before returning to work, and elevate both of her legs above her chest every hour.  *Id.*  He also said that Plaintiff could lift and carry either occasionally or frequently between 0 to 5 pounds and that she could never lift more than 20 pounds.  *Id.*  Dr. Torelli then opined that Plaintiff had significant limitations in reaching, handling, or fingering.  *Id.*  In stark contrast to the prior questionnaire,

Dr. Torelli further opined that Plaintiff could never or rarely grasp, turn and twist objects or use her hands/fingers for fine manipulation. *Id.* at 388. In addition, he said Plaintiff could never or rarely use her right arm for reaching but could occasionally use her left arm to do so. *Id.* As such, Dr. Torelli stated that Plaintiff's symptoms would likely increase if she were placed in a competitive environment and she would frequently experience symptoms severe enough to interfere with attention and concentration. *Id.* He also said that Plaintiff would be absent from work more than three times per month. *Id.* at 389. Lastly, Dr. Torelli commented that Plaintiff was depressed due to her pain. *Id.*

### c.   Andrea Pollack, D.O.

On September 2, 2014, Dr. Pollack conducted an internal medicine examination of Plaintiff following a referral by the Division of Disability Determination. *Id.* at 369-73. Dr. Pollack went through Plaintiff's history and described a number of Plaintiff's conditions: heart disease, diabetes, neck and lower back pain, shoulder pain, wrist pain, colitis, IBS, and sleep apnea. *Id.* at 369. Dr. Pollack listed 11 medications Plaintiff was taking as of the date of this examination and then proceeded to describe Plaintiff's daily activities. *Id.* at 370. Plaintiff was able to do light cooking, cleaning, and laundry. *Id.* She was able to shower and dress, sometimes requiring assistance. She also watches television, listens to the radio, reads, goes into her yard, and socializes with friends. *Id.*

Dr. Pollack conducted a physical examination of Plaintiff and noted that she walked with a slight limp, could squat one-quarter of the way down, had normal stance, used no assistive devices, needed no help changing for the exam or getting on and off the exam table, and was able to rise from her chair without difficulty. *Id.* at 371. Plaintiff's hand and finger dexterity was intact and her grip strength in both hands and strength in her upper and lower extremities were

14

5/5. *Id.* at 372. As to Plaintiff's musculoskeletal exam, Dr. Pollack opined as follows:

"Cervical spine flexion 25 degrees, extension 15 degrees, lateral flexion 15 degrees, and rotation 30 degrees. No scoliosis, kyphosis, or abnormality in thoracic spine. Lumbosacral flexion 30 degrees, lateral flexion 10 degrees, and lumbosacral rotation on the right 15 degrees and on the left 10 degrees. SLR negative bilaterally." *Id.* at 371.

Dr. Pollack concluded that Plaintiff: (1) should be restricted in activities which require fine visual acuity in the left eye; (2) has marked restrictions in squatting, bending, lifting, carrying, pushing, and pulling; (3) has moderate restriction in using her hands, walking, standing, climbing stairs, and kneeling; (4) has mild restriction in reaching; and (5) should avoid heights, operating heavy machinery, activities which require heavy exertion, and activities that may put her at risk for a fall. *Id.* at 372.

### d.    Jacob Center for Advanced Orthopedics

Plaintiff's medical records also show that she visited the Jacob Center for Advanced Orthopedics ("Jacob Center") on November 6, 2014 and September 17, 2015 at which time she complained of right shoulder pain. *See id.* at 379-85. During the first of these visits, Plaintiff was examined by Jesu Jacob, D.O., P.A.A.O.S., P.C. who found that there was no contusion or fracture in the right shoulder, but that Plaintiff had calcific tendinitis and he administered a Dep-Medrol injection. *Id.* at 380-81. Dr. Jacob counseled Plaintiff regarding conservative pain management and recommended six to eight weeks of physical therapy at two to three times per week. *Id.* at 382. Plaintiff was to follow up in six weeks but the next note is not until 10 months later. *See id.* at 382-83. Dr. Jacob's impressions during the second visit were similar to those he observed at Plaintiff's first visit. *See id.* at 379-85.

### D.      The ALJ's Decision

On December 12, 2016, the ALJ determined that Plaintiff was not disabled. *Id.* at 13-21. The ALJ noted Plaintiff's alleged disability began on June 1, 2011 and that she remained insured through December 31, 2016. *Id.* at 13.  The ALJ then applied the five-step sequential evaluation process provided in 20 C.F.R. § 404.1520(a) in rendering a decision whether Plaintiff is disabled within the meaning of the Social Security Act. *Id.* at 13-21.  At step one, the ALJ determined that Plaintiff had not engaged in substantial activity since June 1, 2011. *Id.* at 15.  The Court notes that June 1, 2011 is the date Plaintiff ceased working according to her testimony.  Turning to step two, the ALJ found that Plaintiff suffered "severe impairments" which impose more than minimal limitations on her overall functioning. *Id.*  These impairments included lumbar and cervical degenerative disc disease, sleep apnea, diabetes mellitus, IBS, and anxiety. *Id.* However, the ALJ stated several of these impairments are "non-severe," since they fail to impose even minimal limitation regarding overall function. *Id.*  Specifically, the ALJ deemed Plaintiff's sleep apnea, non-insulin dependent diabetes mellitus, and IBS to be non-severe. *Id.*  The ALJ further noted that the record demonstrated Plaintiff had a history of obesity, but found that not to be a severe impairment. *Id.*  Then, as to Plaintiff's anxiety, the ALJ determined that this mental impairment did not cause more than minimal limitation in her ability to perform basic mental work activities and is non-severe. *Id.* at 16.

At step three, the ALJ evaluated Plaintiff's physical and mental impairments to determine whether these impairments — either independently or in combination — met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*  The ALJ stated that Plaintiff did not have an impairment which met or medically equaled the applicable guideline criteria set forth in Listing 1.04 Disorders of the

spine, such as herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, face arthritis, or vertebral fracture resulting in compromise of a nerve root or the spinal cord.  *See id.* at 16-17.

Before turning to step four, the ALJ engaged in a two-step process to determine whether Plaintiff's symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence "based on the requirements of 20 CFR 404.1529 and SSR 96-4p." *Id.* at 17.  In this two-step inquiry, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  *Id.*  If the answer to that question is in the affirmative, the ALJ must then consider the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."  *Id.*

The ALJ then recited portions of Plaintiff's testimony, noting that Plaintiff had pain in her lower back, neck, hand, and right arm.  *Id.*  He stated Plaintiff had headaches which extended from her neck, and chronic pain in her right hand, right shoulder, lower back, and right foot.  *Id.* Plaintiff was no longer seeing an orthopedist because she could not afford the insurance copays, but she receives care from her longstanding general practitioner.  *Id.* at 17-18.  The ALJ also noted Plaintiff's ability to sit and stand for 15-minute intervals and the difficulty she has raising her arms to reach overhead or make a fist.  *Id.* at 18.  With regard to Plaintiff's daily activities, the ALJ observed that she does little housework, will fold clothes, shop with her husband, and watch television but is distracted by pain.  *Id.*  In addition, she has friends and no difficulty interacting with people.  *Id.*

The ALJ then turned to Plaintiff's treatment history.  After noting that Plaintiff was largely managed by her primary care physician, the ALJ discussed her treatment with Dr. Ratzman.  *Id.*  Plaintiff's conditions presented to Dr. Ratzman at intermittent intervals, were treated on an "as needed" basis.  *Id.*  There were gaps in Plaintiff's care for up to 18 months.  *Id.*  The ALJ pointed out that Dr. Ratzman did not note any limitations precluding employment.  *Id.*  The ALJ then reviewed the MRIs of Plaintiff's right shoulder and lumbar spine before turning to her treatment at the Jacob Center.  *Id.* at 18-19.  He also observed that the notes from the Jacob Center did not include limitations precluding employment.  *Id.* at 19.

The ALJ then addressed the opinions of Dr. Torelli and Dr. Pollack.  He gave "little weight" to the opinion of Dr. Torelli because he found it to be "somewhat differing . . . as his treatment notes, over a long period, fail to establish symptomatology at such a significant level." *Id.* at 20. The ALJ determined Dr. Torelli's notes "reflect[ed] mainly routine and symptomatic care for many conditions that pre-dated the claimant's alleged onset date by many, many years." *Id.*  Further, the ALJ stated the following:

> It is also noted that when Dr. Torelli states that the claimant would need to get up for 20 minutes, after 30 minutes of sitting, he is inferentially contradicting his own expressed limitation regarding standing/walking.  More specifically, if the claimant is able, and advised not to sit (i.e. stand or walk) for 20 minutes, after 30 minutes of sitting, she can inferentially stand/walk in excess of 1 hour during the course of an eight hour workday.

*Id.*

As to Dr. Pollack, the ALJ afforded her opinion "only some weight as the limitations arrived at are not consistent with the actual examination findings."  *Id.*  Specifically, the ALJ found that the limitations described by Dr. Pollack regarding Plaintiff's hands were predicated on Plaintiff's subjective complaints as opposed to the actual examination findings.  *Id.*  Plaintiff's hands were "within normal limits."  *Id.*

18

Turning to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and her past relevant work based upon the medical evidence and testimony presented. *Id.* at 17-21. The ALJ determined that Plaintiff did have the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) "except that she can sit for 6 hours per day with a 2 minute repositioning break after sitting [for] 30 minutes, stand/walk for 2 hours and lift/carry up to 20 pounds, occasionally." *Id.* at 17. As such, the ALJ determined that Plaintiff had the RFC to occasionally bend, squat, crouch, crawl, kneel, climb, stoop, reach overhead, perform simple and complex tasks, and frequently interact with the general public, co-workers, and supervisors. *Id.* However, the ALJ stated that Plaintiff could never work around dangerous heights or machinery but she was capable of performing past relevant work since it does not require the performance of work-related activities precluded by her RFC, pursuant to 20 C.F.R. 404.1565. *Id.* at 17, 21. In drawing this conclusion, the ALJ relied on the testimony of the Vocational Expert. *Id.* Thus, the ALJ found that Plaintiff was not under a disability from June 1, 2011 through the date of his decision. *Id.*

### E.    Cross-Motions for Judgment on the Pleadings

#### 1.    *Plaintiff's Motion*

In her appeal, Plaintiff argues that the ALJ's decision should be reversed on two grounds: (1) the ALJ failed to properly weight the medical opinion evidence; and (2) the ALJ failed to properly evaluate Plaintiff's testimony. *See generally* Pl.'s Mem. As to the first argument, Plaintiff contends that pursuant to the "treating physician rule," the ALJ erroneously afforded Dr. Torelli's opinion "little weight" by deeming it internally inconsistent. *See id.* at 9-10. The ALJ found Dr. Torelli's opinion to have Plaintiff get up for 20 minutes after 30 minutes of sitting to be inconsistent with his opinion regarding Plaintiff's limitations of standing and walking.

Plaintiff argues that Dr. Torelli's treatment notes show his conclusions were based on MRI findings, clinical evidence of neck and back pain, radiating pain to the right leg, and orthopedic examinations. *Id.* Plaintiff concedes that "many of the handwritten notes from Dr. Torelli's office are . . . illegible and likely document other musculoskeletal abnormalities" which support his opinion. *Id.* at 10. However, Plaintiff submits that if the ALJ found these notes to be insufficient, he should have asked for clarification. *Id.* (citing *Garner v. Astrue*, No. 08-cv-6367, 2009 WL 1911744, at *1 (S.D.N.Y. June 30, 2009)). In addition, Plaintiff contends that "[t]here is no reason why" the ALJ should not have been able to reconcile the fact that Plaintiff has to get up for 20 minutes after sitting with her limitation to stand/walk no more than one hour per workday. *See id.*

Plaintiff also disputes the weight the ALJ gave to Dr. Pollack's opinion. *Id.* at 11-12. Plaintiff argues that the ALJ purported to adopt Dr. Pollack's opinion with the exception of her finding that Plaintiff has limitations using her hands but pursuant to "the Commissioner's rule . . . , without good cause to rule otherwise, findings from one-time examining sources are entitled to less weight than those from treating sources." *Id.* at 11 (first citing 20 C.F.R. § 404.1527(c)(2); then citing *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013)). Plaintiff then provides grounds which she believes render reliance on Dr. Pollack's opinion misplaced. Specifically, Plaintiff points out that Dr. Pollack was not provided with any of Plaintiff's x-rays, MRIs, or treatment records and that her "vague statements" as to Plaintiff's "moderate" and "marked" areas of functioning are not specific enough to evaluate Plaintiff's functioning under existing Second Circuit case law. *Id.* at 12-13 (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)). Lastly, Plaintiff finds it ironic that the ALJ "rejected the one portion of the opinion from Dr. Pollack that is clearly consistent with the opinions from the treating doctor," Dr. Torelli –

namely, that both doctors agreed Plaintiff had at least moderate limitations using her hands. *Id.* at 13 (citing Tr. at 373, 388).

With respect to Plaintiff's second argument that the ALJ failed to properly evaluate her testimony, Plaintiff submits that the ALJ used boilerplate language which found her statements "concerning the intensity, persistence, and limiting effect of her symptoms 'not entirely consistent with the medical evidence and other evidence in the record.'" *Id.* at 15-16 (citing Tr. at 20). Plaintiff contends that the ALJ supported his findings by noting Plaintiff "stopped working due to a layoff rather than her medical condition," lack of ongoing orthopedic treatment, and gaps in Plaintiff's treatment. *Id.* at 16 (citing Tr. at 18, 20-21). However, Plaintiff argues these are insufficient bases to discount Plaintiff's testimony and that the ALJ did not consider the possibility that Plaintiff's pain increased over time nor the fact that Plaintiff had a gap in treatment due to a lack of insurance coverage. *Id.* at 16-17. For these reasons, Plaintiff requests that the Commissioner's decision be reversed solely for a calculation and award of benefits, or, alternatively, that the claim be remanded for a new hearing. *Id.* at 17.

### 2.   *Defendant's Cross-Motion*

Defendant's cross-motion for judgment on the pleadings also serves as its opposition to Plaintiff's motion. *See generally* Def.'s Mem. Defendant contends that the ALJ's decision should be affirmed and addressed both of Plaintiff's arguments as follows. According to the Defendant, the ALJ did not need to give controlling weight to Dr. Torelli's opinions because: (1) Dr. Torelli's notes showed mainly routine and symptomatic care for conditions which predated Plaintiff's alleged onset date by many years; and (2) Dr. Torelli's statement that Plaintiff would need to get up for 20 minutes after 30 minutes of sitting inferentially contradicted his limitation pertaining to Plaintiff's ability to stand and walk. *Id.* at 13-14. As such, Defendant submits that

pursuant to applicable case law, the ALJ provided "good reasons" and pointed to specific evidence in the record to decline to give a treating source controlling weight. *Id.* at 14. Further, although Plaintiff conceded that many of the notes from Dr. Torelli's office were illegible, Defendant asserts that "the ALJ never stated he misunderstood any aspect of Dr. Torelli's medical records, or that they were insufficient." *Id.* at 14-15. With respect to the weighing of Dr. Pollack's opinion, Defendant argues that "the Commissioner may rely on the opinions of consultative positions. These medical sources may serve as substantial evidence in support of the ALJ's RFC finding." *Id.* at 15 (citing *Pellam v. Astrue*, 508 Fed. App'x 87, 90 (2d Cir. 2013)). However, to the extent the ALJ afforded little weight to Dr. Pollack's opinion regarding the functionality of Plaintiff's hands, Defendant submits that such assessment was proper because this aspect of Dr. Pollack's opinion conflicted with her physical examination findings. *See id.* at 16 (citing *Woodmancy v. Colvin* 577 Fed. App'x 72, 75 (2d Cir. 2014)). Defendant contends that Dr. Pollack's limitations as to Plaintiff's hands appeared to be predicated on subjective complaints since the physical examination found the hands to be within normal limits. *Id.* at 15-16. According to the Defendant, Dr. Pollack's examination also reflects that Plaintiff was able to perform household tasks such as light cooking, cleaning, and laundry. *Id.* at 15-16.

Turning to the issue of whether the ALJ properly considered Plaintiff's testimony, Defendant maintains that "the ALJ evaluated the entire case record and found that the totality of the medical evidence did not corroborate Ms. Callahan's subjective testimony of her symptoms." *Id.* at 18. First, Defendant points to the ALJ's finding that Plaintiff's alleged onset date coincided with an employment layoff as opposed to a deterioration in her medical condition. *Id.* at 18-19. Then, Defendant looks to the ALJ's finding with respect to the gaps in Plaintiff's treatment. *Id.* at 19. Defendant notes that despite Plaintiff's testimony pertaining to the severity

of her symptoms, the ALJ considered the record which demonstrated Plaintiff had a lack of regular orthopedic treatment from August 2011 through June 2011—with gaps from as little as a few months to 18 months. *Id.*

### 3.    *Plaintiff's Reply*

Plaintiff filed a reply to Defendant's cross-motion. *See generally* Reply Memorandum in Further Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Reply") [DE 19]. Plaintiff first addresses the illegibility of Dr. Torelli's notes and submits that Defendant did not provide any authority to contradict numerous cases which purportedly held remand to be required when a treating doctor's notes are illegible. *Id.* at 2 (citing *Owens v. Berryhill*, No. 2:17-cv-2632, 2018 WL 1865917, at *7-8 (E.D.N.Y. April 18, 2018)). Plaintiff then repeats her argument that the ALJ should not have relied on Dr. Pollack's opinion because Dr. Pollack did not review the relevant MRI testing. *Id.* Plaintiff also notes that Defendant did not refute Plaintiff's contention that Dr. Pollack's opinion was vague. *Id.* Lastly, Plaintiff addresses Defendant's argument that Plaintiff's ability to perform household tasks such as cooking, cleaning, and laundry provides a basis to contradict Dr. Pollack's opinion. *Id.* at 2. Plaintiff submits that the ALJ never discounted Dr. Torelli's opinion on that basis and, consequently, this Court cannot affirm administrative action on grounds different from those considered by the agency. *See id.* at 2.

### III.    STANDARD OF REVIEW

42 U.S.C. Section 405(g) provides that

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further

time as the Commissioner of Social Security may allow. Such action
shall be brought in the district court of the United States. . . .

42 U.S.C. § 405(g).  However, "the Court's function is not to evaluate *de novo* whether the claimant is disabled, but rather to determine only 'whether the correct legal standards were applied and whether substantial evidence supports the decision.'"  *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 50–51 (E.D.N.Y. 2015) (quoting *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005)); *Marinello v. Comm'r of Social Security*, 98 F. Supp. 3d 588, 591 (E.D.N.Y. 2015); *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010); *see also Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .").  Put another way, "a district court may set aside the Commissioner's determination that a claimant is not disabled [only] where the factual findings underlying the decision are not supported by substantial evidence or if the decision is based on legal error."  *Provisero v. Colvin*, No. 14-CV-1830, 2016 WL 4186980, at *9 (E.D.N.Y. Aug. 8, 2016); *Smith v. Colvin*, No. 14-CV-5868, 2016 WL 5395841, at *13 (E.D.N.Y. Sep. 27, 2016).  Thus, although the reviewing court is obliged to "examine the entire record, weighing the evidence on both sides to ensure that the claim has been fairly evaluated," *Nascimento*, 90 F. Supp. 3d at 51, "the Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Provisero*, 2016 WL 4186980, at *9 (quoting *Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998)); *See Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014) ("before the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in the light of correct legal standards") (internal citation omitted).

24

When reviewing the decision of the Commissioner, a court must be mindful that an ALJ's "[f]ailure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir.2008) (citations omitted); *Smith*, 17 F. Supp. 3d at 264. It follows that the "Commissioner's determination cannot be upheld when it is based on an erroneous view of the law, or misapplication of the regulations, that disregards highly probative evidence." *Id.*; *see Grey v. Heckler*, 721 F.2d 41, 44 (2d Cir. 1983); *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987) ("Failure to apply the correct legal standards is grounds for reversal."); *McKinzie v. Astrue*, No. 07-CV-733, 2010 WL 276740, at *6 (W.D.N.Y. Jan. 20, 2010)).

If the reviewing court is satisfied that the ALJ's decision is free of legal error, the court turns its attention to whether substantial evidence supports the ALJ's decision. *Smith*, 17 F. Supp. 3d at 264; *Nunez v. Astrue*, No. 11 CIV. 8711, 2013 WL 3753421, at *6 (S.D.N.Y. July 17, 2013) ("First, the court must review whether the Commissioner applied the correct legal standard. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence.") (internal quotations and citation omitted). "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)); *Provisero*, 2016 WL 4186980, at *9; *Nascimento*, 90 F. Supp. 3d at 51. Notably, the reviewing court must apply the "substantial evidence" standard equally to findings of fact made by the SSA as well as inferences and conclusions of law drawn from those facts. *Nascimento*, 90 F. Supp. 3d at 51; *Marinello*, 98 F. Supp. 3d at 591; *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999); *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994). Importantly, the findings of the ALJ

25

may be considered to meet the substantial evidence standard even where "he or she fails to recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of [his or her] decision." *Provisero*, 2016 WL 4186980, at *9; (quoting *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013)) (internal quotations omitted); *DiCarlo v. Colvin*, No. 15-CV-0258, 2016 WL 4734633, at *13 (E.D.N.Y. Sep. 9, 2016).  Further, this precept is true even in the face of contrary evidence.  *Provisero*, 2016 WL 4186980, at *9; *Smith*, 2016 WL 5395841, at *14; *see Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004).

Although the ALJ is not required to resolve every conflict on the record, *Nascimento*, 90 F. Supp. 3d at 51, *Marinello*, 98 F. Supp. 3d at 591, "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 268–269 (S.D.N.Y. 2010) (alteration in original).  Such a process is significant because it remains solely the province of the SSA to weigh the evidence — including resolving evidentiary conflicts and judging the credibility of witnesses.  *Nascimento*, 90 F. Supp. 3d at 51; *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see also Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998).  As such, the necessary corollary is that "the Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a d*e novo* review." *Provisero*, 2016 WL 4186980, at *9; *Smith*, 2016 WL 5395841, at *14; *DiCarlo*, 2016 WL 4734633, at *14.  Notwithstanding that principle, however, the "ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Id.* (internal quotation marks omitted); *Kane v. Astrue*, 942 F. Supp. 2d 301, 305 (E.D.N.Y. 2013) (quoting *Rodriguez v. Astrue*, No. 11 CIV. 7720, 2012 WL 4477244, at *30 (S.D.N.Y. Sep. 28, 2012)) (internal quotations omitted).  In the

event gaps remain in the administrative record, or the court determines that the ALJ misapplied the applicable legal standard, remand to the SSA for further findings may be appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *Nascimento*, 90 F. Supp. 3d at 51; *Marinello*, 98 F. Supp. 3d at 592.

## IV.   RELEVANT PROVISIONS OF THE SOCIAL SECURITY ACT

In order for a claimant to be found "disabled" within the meaning of the Social Security Act, he or she must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Nascimento*, 90 F. Supp. 3d at 51; *Provisero*, 2016 WL 4186980, at *10. Likewise, a claimant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(c) ("You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."); *see Nascimento*, 90 F. Supp. 3d at 51; *Marinello*, 98 F. Supp. 3d at 592-93. Further, in determining whether an individual's physical and mental impairments meet the definition of "disability," as set forth in 42 U.S.C. § 423(d), "the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without

regard to whether any such impairment, if considered separately, would be of such severity.  If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); *see* 20 C.F.R. § 404.1520(a)(4)(ii). Importantly, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).

In order to determine whether a claimant is disabled within the meaning of the Act, the SSA follows a five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4) (identical five-step sequential process used in SSI determinations). The regulations provide that where the SSA is able to find a claimant disabled or not disabled prior to reaching the final step, the SSA will make its "determination or decision and [will] not go on to the next step.  [However,] [i]f [the SSA] cannot find that [the claimant is] disabled or not disabled at a step, [the SSA proceeds] to the next step."  20 C.F.R.   § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *Stephens v. Colvin*, No. 3:15-CV-00622, 2016 WL 4094885, at *2 (N.D.N.Y. Aug. 2, 2016) ("If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.") (quoting *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L.Ed.2d 333 (2003)).  The five-step evaluation process is as follows:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. See paragraphs (f) and (h) of this section and § 404.1560(b).

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. See paragraphs (g) and (h) of this section and § 404.1560(c).

20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v); *see Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (recognizing that the "SSA regulations prescribe a five-step process for evaluating disability claims"); *Nascimento*, 90 F. Supp. 3d at 51-52; *Marinello*, 98 F. Supp. 3d at 593.  The burden of proof rests with the claimant at the first four steps, while the burden shifts to the SSA at the fifth step.  *Talavera*, 697 F.3d at 151; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *Stephens*, 2016 WL 4094885, at *2; *Nascimento*, 90 F. Supp. 3d at 52; *see Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986) ("Once a disability claimant proves that his severe impairment prevents him from performing his past work, the Secretary then has the burden [at step five] of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.").

In general, the SSA meets its burden at step five "by resorting to the applicable medical vocational guidelines (the grids)."  *Bapp*, 802 F.2d at 604; *Roma v. Astrue*, 468 Fed. App'x 16, 20 (2d Cir. 2012) ("The ALJ ordinarily meets this burden by utilizing the applicable medical

vocational guidelines. . . .”); *Thompson v. Barnhart,* 75 Fed. App’x 842, 844 (2d Cir. 2003); *Provisero*, 2016 WL 4186980, at *10; *Traufler v. Astrue*, No. CIV. A. 7:11-1089, 2012 WL 7753772, at *3 (N.D.N.Y. Nov. 30, 2012), *report and recommendation adopted*, No. 7:11-CV-1089, 2013 WL 1092124 (N.D.N.Y. Mar. 15, 2013); *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir. 1996) (“Generally speaking, if a claimant suffers only from exertional impairments, e.g., strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids.”); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 2 (Medical Vocational Guidelines) (hereafter, the “Grids”).  The Grids “take[ ] into account the claimant’s residual functional capacity in conjunction with the claimant’s age, education and work experience.”  *Roma*, 468 F. App’x at 20 (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y.1996)); *Provisero*, 2016 WL 4186980, at *10.  In view of these considerations, “the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy.”  *Roma*, 468 F. App’x at 20.  Nevertheless, “exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant’s physical limitations. *Id*.; *Rosa*, 168 F.3d at 78.  Physical limitations are also referred to as “exertional limitations” and are defined as “limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling) . . . .”  20 C.F.R. § 404.1569a(b).

Similarly, where a claimant “suffers from additional ‘nonexertional’ impairments, the grid rules may not be controlling.  *Bapp*, 802 F.2d at 604; *see Pratts*, 94 F.3d at 39. Nonexertional limitations are defined as “restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet the demands of jobs other than the

strength demands." 20 C.F.R. § 404.1569a(c).  The applicable section of the Code of Federal

Regulations, 20 C.F.R. § Pt. 404, Subpt. P, App. 2, explains that

> where an individual has an impairment or combination of
> impairments resulting in both strength limitations and nonexertional
> limitations, the rules in this subpart are considered in determining
> first whether a finding of disabled may be possible based on the
> strength limitations alone and, if not, the rule(s) reflecting the
> individual's maximum residual strength capabilities, age, education,
> and work experience *provide a framework for consideration of how
> much the individual's work capability is further diminished* in terms
> of any types of jobs that would be contraindicated by the
> nonexertional limitations. Also, *in these combinations of
> nonexertional and exertional limitations which cannot be wholly
> determined under the rules* in this appendix 2, full consideration
> must be given to all of the relevant facts in the case in accordance
> with the definitions and discussions of each factor in the appropriate
> sections of the regulations, which will provide insight into the
> adjudicative weight to be accorded each factor.

20 C.F.R. § Pt. 404, Subpt. P, App. 2 (emphasis added); *see Provisero*, 2016 WL 4186980, at

*15 (recognizing that where a "claimant has both exertional and nonexertional limitations, the

Grids are merely to be used as a framework in the disability determination, and the ALJ must

consider and address on the record the combined effects of the claimant's exertional and non-

exertional limitations and the advisability of additional testimony before resorting to the

[Grids].") (internal quotations and citation omitted); *Nigino v. Astrue*, No. 04-CV-3207, 2009

WL 840382, at *5 (E.D.N.Y. Mar. 30, 2009) ("[A]lthough the grids generally direct a disability

determination where a claimant complains of exertional impairments only, they will not apply

where a claimant suffers solely from non-exertional limitations, and may not provide an

exclusive framework for the disability evaluation where a combination of these impairments are

in play."); *see Johnston v. Astrue*, No. 07–CV–5089, 2008 WL 4224059, at *11 (E.D.N.Y.

Sep. 8, 2008) ("[W]here a claimant suffers from a combination of exertional and nonexertional

impairments the guidelines cannot provide the exclusive framework for making a disability

determination.") (internal citation omitted); *Williams v. Astrue*, No. 09-CV-3997, 2010 WL 5126208, at *10 (E.D.N.Y. Dec. 9, 2010) ("if a claimant has nonexertional limitations in addition to exertional limitations, the Grid may not be dispositive of the disability determination"); *see also* 20 C.F.R. § 404.1569a(d) ("If your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we will not directly apply the rules in appendix 2 unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision.").

Although the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines," *Zabala v. Astrue*, 595 F.3d 402, 410–11 (2d Cir. 2010), in the event the ALJ determines that a claimant's nonexertional limitations "significantly diminish the range of work the claimant can perform, he must hear testimony from a vocational expert or seek out similar evidence that there are jobs in the national economy which the claimant can obtain and perform." *Provisero*, 2016 WL 4186980, at *16 (quoting *Williams*, 2010 WL 5126208, at *11).  Notably, "[t]he range of work is significantly [diminished] by nonexertional limitations when a claimant suffers an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him [or her] of a meaningful employment opportunity.'" *Williams*, 2010 WL 5126208, at *11 (quoting *Bapp*, 802 F.2d at 606) (alterations in original).

## V.    DISCUSSION

### A.    Whether the ALJ Applied the Correct Legal Standards to the Medical Opinion Evidence

#### 1.    Legal Principles

##### a.    Standards Regarding Application of Medical Opinion Evidence Generally

Pursuant to 20 C.F.R. § 416.927, medical opinion evidence is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).  In determining the overall weight to ascribe to particular medical opinion evidence, the regulations direct that all of the following factors be considered: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; (6) other factors (*i.e.*, "factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion").  20 C.F.R. § 416.927 (c)(1)-(6); *see Smith*, 2016 WL 5395841, at *18 (applying 20 C.F.R. § 404.1527 which sets forth the identical framework for weighing medical opinions in 20 C.F.R. Part 404 disability cases); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Halloran*, 362 F.3d at 32; *Smith*, 17 F. Supp. 3d at 268.

With respect to opinions provided by consultative sources, the regulations provide that

> State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence[.]

> . . .
>
> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.

20 C.F.R. § 416.927(e)(2)(i), (ii).  Therefore, the opinions of consulting sources "may constitute substantial evidence if they are consistent with the record as a whole."  *Barringer v. Commissioner of Social Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) ("It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions."); *see, e.g.*, *Rosier v. Colvin*, 586 Fed. App'x 756, 758 (2d Cir. 2014) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own testimony, and the medical tests together constitute substantial evidence adequately supporting the [Commissioner's] conclusion that the plaintiff's injuries did not prevent her from resuming her job as a sewing machine operator."); *Fuentes v. Colvin*, No. 13–CV–6201, 2015 WL 631969 at *8 (W.D.N.Y. Feb. 13, 2015) ("The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision.") (internal quotations and citation omitted); *Frawley v. Colvin*, No. 5:13–CV–1567, 2014 WL 6810661 at *9 (N.D.N.Y. Dec. 2, 2014) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, [they are] supported by the medical evidence in

the record."); *Leisten v. Colvin*, No. 12–CV–6698, 2014 WL 4275720 at *14 (W.D.N.Y. Aug. 28, 2014).

### b.      The Treating Physician Rule

The aptly named "treating physician rule," codified at 20 C.F.R. § 416.927(c)(2) and 20 C.F.R. 404.527(c)(2), states that the Commissioner generally affords greater weight

> to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 416.927(c)(2).  In the event the ALJ decides not to give controlling weight to the medical opinion evidence provided by a claimant's treating source, he or she is required to provide good reasons for the weight ascribed, and, in any event, "must consider various 'factors' to determine how much weight to give to the opinion.  Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."  *Halloran*, 362 F.3d at 32; *see Smith*, 17 F. Supp. 3d at 268; *Norman v. Astrue*, 912 F. Supp. 2d 33, 42 (S.D.N.Y.

2012) (recognizing that where treating source's opinion is not given controlling weight, the Commissioner must assess the factors set forth in 20 C.F.R. § 416.927(c)(2) and must enumerate "good reasons" for the decision).

In the event the ALJ affords less than controlling weight to a treating source's opinion or otherwise fails to specifically set forth the overall weight the opinion was given (whether controlling weight or some lesser weight), the regulations generally require remand to the Commissioner for further factual findings. *Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *see Norman*, 912 F. Supp. 2d at 42 ("The failure of the ALJ to provide 'good reason' for not giving Dr. Beale's opinions controlling weight, to mention the weight his opinions were given, and to apply the factors set forth in the regulations are sufficient grounds for remand; *Pierre v. Astrue*, No. 09-CV-1864, 2010 WL 92921, at *1 (E.D.N.Y. Jan. 6, 2010) (finding that the ALJ failed to provide good reasons for not according treating physicians' opinions controlling weight and "failed even to mention the weight these opinions were given"); *Smith*, 17 F. Supp. 3d at 268 (finding remand necessary where the ALJ's decision "contains no specific reference to th[e] evidence [provided by claimant's treating physician], nor is there any discussion of the ALJ's reasons for the weight, or lack of weight, he attributed to the information in [the treating physician's] reports.").

### 2. Whether the ALJ Properly Weighed the Opinion Evidence of Dr. Torelli and Dr. Pollack

Plaintiff's primary argument centers on the overall weight afforded to the opinions of Dr. Torelli and Dr. Pollack. As to Dr. Torelli who is the treating physician, Plaintiff argues that the

ALJ did not set forth good reasons for not giving his opinion controlling weight.  Pl.'s Mem. at 8-10.  Plaintiff contends that the ALJ committed error by affording Dr. Torelli's opinions "little weight" because his opinions were not internally inconsistent and were supported by his treatment notes.  *Id.* at 9-11.  As to Dr. Pollack, the consultative examiner, Plaintiff argues the ALJ erroneously relied on her opinion despite the fact that she was not given Plaintiff's treatment records, that her opinion was vague, and that the ALJ erroneously rejected the portion of Dr. Pollack's opinion regarding Plaintiff's hands.  *Id.* at 12-13.

### a.    Dr. Torelli

The Court first addresses the weight the ALJ afforded Dr. Torelli's opinion.  The ALJ was required to determine whether, in accordance with the "treating physician rule," Dr. Torelli's opinions should be accorded controlling weight, and, if not, to provide good reasons for the weight actually given to them.  *See Stango v. Colvin*, No. 3:14-CV-01007, 2016 WL 3369612, at *11 (D. Conn. June 17, 2016) ("the Court is aware of no authority that determines that a treating physician's opinion should be cast aside where it does not include a function-by-function assessment of the claimant's capabilities."); *Sink v. Colvin*, No. 1:12-CV-00239, 2015 WL 3604655, at *17 (W.D.N.Y. June 8, 2015) ("A medical source's opinion that does not address every function with respect to physical limitations is not invalid or insufficient.  A function-by-function analysis is unnecessary."); *see also Halloran*, 362 F.3d at 32-33 (emphasizing that "under the regulations, the Commissioner is required to provide 'good reasons' for the weight she gives to the treating source's opinion"); *Smith*, 17 F. Supp. 3d at 268 (same).  In addition, "[i]t is the rule in the [Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'"  *Norman*, 912 F. Supp. 2d at 73 (quoting *Pratts*, 94 F.3d at 37) (alterations in

original).  Therefore, the ALJ is required to "seek additional evidence or clarification from [claimant's] medical source when the report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010); *Norman*, 912 F. Supp. 2d at 73.

In substantiating his decision regarding Plaintiff's RFC, the ALJ addressed the opinions of Dr. Torelli as set forth in an Impairment Questionnaire dated September 2014 and in a Disability Impairment Questionnaire dated October 22, 2015. *Id.* at 19-20.  As to the ALJ's conclusion that Dr. Torelli's opinions are unsupported by his treatment notes, the only explanation that the ALJ provides is that the "treatment notes, over a long period, fail to establish symptomatology at such a significant level.  In fact, these notes reflect mainly routine and symptomatic care for many conditions that pre dated the claimant's alleged onset date by many years." *Id.* at 20.  However, it is significant that the ALJ does not specifically address nor go into the details as to what the treatment notes say or whose notes he is relying on to support his conclusion.  Although Plaintiff began seeking treatment from Dr. Torelli as early as February 2000, there are regrettably no treatment notes in the record for the majority of the time Plaintiff was under Dr. Torelli's care—and the ALJ did not seek to obtain additional records from Dr. Torelli.  The only treatment notes the ALJ considered from Dr. Torelli's practice were dated between October 2014 and August 2016 and were summarized as follows: "Over the course of treatment the claimant experienced symptoms of lumbago, and dizziness.  Records noted the decreased range of motion [in] the back. The claimant was diagnosed with anxiety, diabetes mellitus, coronary artery disease, and hypertension." *Id.* at 19.  In violation of the treating

38

physician rule, the ALJ failed to assess several of the required factors -- such as the length, nature, and extent of the treatment relationship between Dr. Torelli and Plaintiff, the evidence in support of Dr. Torelli's opinion, and the consistency of Dr. Torelli's opinion with the other evidence in the record, including diagnostic tests -- to comprehensively set forth the reasons for the weight assigned to Dr. Torelli's opinion. *See Gallishaw v. Comm'r of Soc. Sec.*, 296 F. Supp. 3d 484, 496 (E.D.N.Y. 2017).

Moreover, to the extent the ALJ disregarded Dr. Torelli's opinion because he believed Dr. Torelli contradicted himself -- in questionnaires from September 2014 and October 2015 when recommending limitations as to Plaintiff's ability to sit, stand, and walk for certain periods of time -- Plaintiff argues that the ALJ should have asked for clarification from Dr. Torelli. Pl.'s Mem. at 11. As mentioned above, the ALJ has an "affirmative obligation to fully develop the administrative record" in accordance with the mandate of 20 C.F.R. § 404.1512(e)(1). *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269, 274 (S.D.N.Y. 2010). "[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion." *Id.* (citing *Rosa v. Callahan*, 168. F.3d 72, 79 (2d Cir. 1999)). Most critically, "[t]his rule applies, however, where a medical source's opinion is *internally inconsistent*, not where it is inconsistent with other evidence in the record." *Carney v. Berryhill*, No. 16-CV-269-FPG, at *5 (W.D.N.Y. May 12, 2017) (citing *Allen v. Colvin*, No. 3:14-CV-1368, 2016 WL 1261103, at *12 (N.D.N.Y. Mar. 30, 2016)); *see also Pokorny v. Astrue*, No. 09-CV-1694, 2010 WL 5173593, at *3 (E.D.N.Y. Dec. 14, 2010) ("[A]n ALJ may not reject a treating physician's disability opinion based 'solely' on internal conflicts in

that physician's clinical findings." (quoting *Carvey v. Astrue*, No. 09–cv–4438, 2010 WL 2264932, at *2 (2d Cir. June 7, 2010))).

Here, the aspect of Dr. Torelli's opinion criticized by the ALJ was the restriction that Plaintiff could not sit or walk for more than one hour in an eight-hour work day, and would have to get up from a seated position every 30 minutes for a period of 20 minutes before returning to work.  Tr. at 20.  The ALJ determined Dr. Torelli "inferentially contradict[ed]" himself because "if the claimant is able, and advised to . . . stand or walk[] for 20 minutes, after 30 minutes of sitting, she can inferentially stand/walk in excess of 1 hour . . . during the course of an eight hour workday."  *Id.*  The Court acknowledges that in Plaintiff's motion, she argues that "[t]here is no reason why an individual who must get up and move around for 20 minutes after sitting cannot also be limited to stand/walk no more than 1 hour total in an 8-hour workday."  Pl.'s Mem. at 11.  The Court finds Plaintiff's argument persuasive and does not find this opinion to be inconsistent.  The ALJ's inferential hypothetical seems to disregard the aspect of Dr. Torelli's opinion which states that Plaintiff cannot sit for more than one hour per day.  If Plaintiff cannot sit for more than one hour in a workday, and she can only sit for 30-minute intervals, it necessarily follows that Plaintiff would only take two 20-minute breaks from sitting before reaching her one hour sitting capacity.  This would leave Plaintiff with an additional 20 minutes of standing or walking time and she would not exceed her one-hour total under Dr. Torelli's opinion.  However, even if this opinion were inconsistent, it is not inconsistent with the record as a whole and the ALJ committed legal error by failing to contact Dr. Torelli to obtain clarification.

The Court concludes that by affording "little weight" to Dr. Torelli's opinion, without conducting any investigation into the omissions or inconsistences arising from his opinion nor providing a meaningful rationale to deem his opinion contradictory, the ALJ's explanation "falls

far short of the standard for contradictory evidence required to override the weight normally assigned to the treating physician's opinion." *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) ("ALJ did not provide a meaningful rationale for her rejection of the findings of . . . Plaintiff's treating physician. . . . [S]he failed to explain how [the treating physician's] opinion was unsupported by medically acceptable evidence or inconsistent with other substantial evidence in the record.").

Moreover, the Court points out that the ALJ did not identify the treating physician rule in his decision and requests that the ALJ explicitly reference this standard on remand. *See Torres v. Barnhart*, No. 01-6051, 2005 WL 147412, *7 (E.D.N.Y. Jan. 24, 2005). In the event the ALJ decides not to give controlling weight to the medical opinion evidence provided by Dr. Torelli, the Court further requests that the ALJ address each of the factors set forth above which an ALJ is required to consider in determining how much weight to give to the opinion. *Norman*, 912 F. Supp. 2d at 42 (recognizing that where treating source's opinion is not given controlling weight, the Commissioner must assess the factors set forth in 20 C.F.R. § 416.927(c)(2) and must enumerate "good reasons" for the decision).

### b.    Dr. Pollack

Turning to Dr. Pollack, Plaintiff generally argues that the ALJ erred by affording Dr. Pollack's opinion more weight than Dr. Torelli's. Pl.'s Mem. at 11-13. More specifically, it is Plaintiff's position that the ALJ's reliance here was misplaced because Dr. Pollack was not provided with Plaintiff's x-rays, MRIs, or treatment records and was vague in opining that Plaintiff had "moderate" and "marked" limitations in some areas of functioning. *Id.* at 12-13. Plaintiff contends the ALJ also erred by ignoring Dr. Pollack's opinion that Plaintiff had at least moderate limitations using her hands since this was consistent with the opinion provided by Dr.

Torelli.  *Id.* at 13.  In response, Defendant argues that the ALJ could rely on Dr. Pollack's opinion as a consultative physician and the ALJ properly afforded this opinion "some weight" because her examination findings conflicted with her opinion as to Plaintiff's hand limitations. Def.'s Mem. at 15-17.

Generally, ALJs should not rely heavily on the findings of consultative physicians after a single examination.  *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (citing *Cruz v. Sullivan*, 912 F. 2d 8, 13 (2d Cir. 1990)).  Here, the ALJ afforded Dr. Pollack's opinion "some weight" as opposed to the "little weight" afforded Dr. Torelli's opinion.  As a result, Dr. Pollack's opinion was apparently more controlling than Dr. Torelli's in the ALJ's mind.  However, the ALJ's having afforded controlling weight to the consultative examiner's opinion is undermined in several respects.  In *Jackson v. Colvin*, the court held that the ALJ erred in giving the opinion of the consultative physician great weight because: (1) the consultative physician was not provided with the plaintiff's medical records and the opinion lacked supporting and explanatory documentation; (2) the limited nature of a consultative evaluation; and (3) the ALJ's improper assessment of the treating physician's opinion.  *See Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *20 (S.D.N.Y. Sept. 3, 2014) (finding ALJ erred in giving the consultative physician's opinion great weight, in part, because the physician not being provided medical records).  Similarly in the instant case, Dr. Pollack was not provided Plaintiff's previous scans or medical records and was a one-time examining source.  For the reasons set forth above, the ALJ improperly applied the treating physician rule to Dr. Torelli.

In addition, Plaintiff also contends that Dr. Pollack's use of the terms "marked" and "moderate" in describing limitations on functioning were not specific enough for the ALJ to rely upon as substantial evidence.  Pl.'s Mem. at 12-13.  However, the Court is not in a position to

assess objections to substantial evidence because the ALJ's decision contains legal error.  "[A] district court may not assess objections as to 'substantial evidence' where an ALJ decision is infected with legal error."  *Stango*, 2016 WL 3369612, at *16; *see Agapito v. Colvin*, No. 12 CIV. 2108, 2014 WL 774689, at *23 (S.D.N.Y. Feb. 20, 2014) ("Because I find legal error requiring remand, I do not reach the issue of whether the ALJ's decision was supported by substantial evidence."); *see also Johnson*, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles."); *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) ("Because the ALJ neglected to engage in the proper legal standard we cannot subject his determination to meaningful review.").

Although the ALJ afforded Dr. Pollack's opinion some weight, the ALJ also found her examination to be inconsistent with her opinion as to the functionality of Plaintiff's hands. When evaluating medical opinion evidence -- whether emanating from a treating or consultative source -- "there is no 'absolute bar to crediting only portions of medical source opinions.'" *Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015) (quoting *Younes v. Colvin*, No. 1:14-CV-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)).  However, where the ALJ's "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (quoting Soc. Sec. Ruling 96–8p, 1996 WL 374184, at *7 (1996)).  Consequently, an ALJ who elects to adopt only portions of a medical opinion must explain his or her decision to reject the remaining portions.  *See Younes*, 2015 WL

1524417, at *8 (although an ALJ is free to credit only a portion of a medical opinion, "when doing so smacks of 'cherry picking' of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently"); *Phelps v. Colvin*, No. 12-CV-976S, 2014 WL 122189, at *4 (W.D.N.Y. 2014) ("[t]he selective adoption of only the least supportive portions of a medical source's statements is not permissible") (internal quotations and brackets omitted); *Caternolo v. Astrue*, No. 6:11-CV-6601, 2013 WL 1819264, at *9 (W.D.N.Y. 2013) ("[i]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination") (internal quotations omitted) (collecting cases); *Searles v. Astrue*, No. 09-CV-6117, 2010 WL 2998676, at *4 (W.D.N.Y. 2010) ("[a]n ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified"); *see also Dioguardi*, 445 F. Supp. 2d at 297 ("The plaintiff [ ] is entitled to know why the ALJ chose to disregard the portions of the medical opinions that were beneficial to her application for benefits.").

To the extent that the ALJ found Dr. Pollack's opinion to be inconsistent with respect to the functionality of Plaintiff's hands, the ALJ made no effort to reconcile this contradiction by contacting Dr. Pollack, nor did the ALJ provide an explanation why he discredited this opinion, despite the fact that Plaintiff's treating physician reached a similar conclusion. *See id*. at 388 (Dr. Torelli opining that Plaintiff has "significant limitations in reaching, handling, or fingering"). Notably, this consistency was omitted from the ALJ's rationale. Not only does it appear that the ALJ was selectively parsing the evidence, he also substituted his own opinion for Dr. Pollack's. The ALJ proclaimed that Dr. Pollack's examination found Plaintiff's hands to be "within normal limits" in order to provide an explanation for his selective weighting process.

*See* Tr. at 20, 372-73.  In addition, the ALJ also stated that it appeared to him Dr. Pollack's limitations were based on Plaintiff's subjective complaints.  *Id.* at 20.  At no point did the ALJ obtain clarification from Dr. Pollack to confirm the grounds upon which she based the hand limitations described in her opinion.  "It is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.'" *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (alterations in original) (citing *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983). On remand, the ALJ will need to reevaluate the weight he accorded the different aspects of Dr. Pollack's opinions.

### B.    Whether the ALJ Properly Evaluated Plaintiff's Testimony

Plaintiff's final argument is that the ALJ failed to properly evaluate her subjective complaints.  Pl.'s Mem. at 14-17.  When assessing a claimant's credibility, an ALJ engages in a two-step analysis.  First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3P (S.S.A.), 2016 WL 1119029, *2.  If the ALJ determines that the condition could be expected to produce the pain/symptoms alleged, then the ALJ will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*  The ALJ conceded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. at 20.  However, the ALJ found that Plaintiff's symptoms were not consistent with the medical evidence and other evidence in the record.  *Id.*

45

The Court finds that the ALJ used disapproved "boilerplate" language rejecting Plaintiff's statements as incredible because "her symptoms are not entirely consistent with the medical evidence and other evidence in the record."  *See* Pl.'s Mem. at 15-16; Tr. at 20; *see also Jackson*, 2014 WL 4695080, at *21 (finding ALJ "use[d] disapproved 'boiler plate' language rejecting Jackson's statements as incredible because 'they [were] inconsistent with the above residual functional capacity assessment.'" (second alteration in original)).  However, the ALJ did not rely solely on this justification for his credibility finding.  The ALJ further explained that Plaintiff's alleged onset date "coincide[d] with an employment layoff as opposed to a deterioration in her medical condition" and that Plaintiff had a lack of regular orthopedic care which showed her impairments were manageable.  Tr. at 20.

In light of the fact that the Court is recommending that this case be remanded for further development of the record, Plaintiff's credibility and RFC will both need to be reassessed in light of the new evidence.  *See Jackson*, 2014 WL 4695080, at *21.  However, if the ALJ makes a negative credibility assessment, he will need to take steps to provide a detailed explanation as to what specific evidence in the record contradicts Plaintiff's subjective testimony.  As noted by the ALJ, Plaintiff's onset date of June 10, 2011 does coincide with the termination of her employment from Brookhaven National Lab.  *See* Tr. at 34.  The earliest treatment note in the record is not until almost two months after that date when Plaintiff was examined by Dr. Ratzman on August 1, 2011 -- due to pain in her left shoulder which showed calcification subacromially and greater tuberosity with hypertrophic changes at the AC joint and inferior spurring.  Tr. at 342, 362.  The record is sparse with respect to evidence pre-dating Plaintiff's onset date.

46

Notwithstanding these circumstances, where an ALJ draws a negative inference due to a claimant's inconsistent medical history, such an inference may be impermissible if the claimant had good reasons to explain the intermittent treatment. *See Cordeiro v. Saul*, 391 F. Supp. 3d 170, 179 (D. Mass. 2019) *reconsideration denied,* No. CV 18-10203-PBS, 2019 WL 7039613 (D. Mass. Dec. 20, 2019). Plaintiff testified that she was not currently seeking treatment for her hands, neck, and other body parts because she was unable to afford it through her insurance which is provided through her husband's employer. Tr. at 42. In his summary of the record, the ALJ does mention that Plaintiff was not currently being treated by an orthopedist. However, when assessing the Plaintiff's credibility, the ALJ omits the fact that Plaintiff stated she could not afford such treatment. *See id.* at 16-17, 20-21. The ALJ should evaluate Plaintiff's inability to pay for orthopedic care when considering her inconsistent treatment history in his credibility determination on remand.

## VI.   REMAND FOR FURTHER PROCEEDINGS IS APPROPRIATE

Remand for further proceedings is generally the appropriate form of relief "in cases in which the Commissioner has failed to provide a full and fair hearing, to make explicit findings, *or to have correctly applied the . . . regulations*. Manago*, 321 F. Supp. 2d at 568 (emphasis added); *see Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999); *Rosa*, 168 F.3d at 82–83; *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). Here, where the ALJ misapplied the Commissioner's own regulation, *i.e.*, the treating physician rule, the exercise of remanding for further proceedings is far from an academic exercise and could lead to a different result. The ALJ's re-application of the treating physician rule could not only impact his weighting of Dr. Torelli's opinion, but his weighting of Dr. Pollack's opinion as well. Moreover, the Court identified an omission in the ALJ's credibility finding as to Plaintiff's intermittent orthopedic care which should be further

developed as well.  Thus, the Court finds that remand for further proceedings is appropriate in this case.

## VII.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Seybert that Plaintiff's motion for judgment on the pleadings be GRANTED and Defendant's cross-motion for judgment on the pleadings be DENIED.  The Court further recommends that this case be REMANDED to the Commissioner for further proceedings in accordance with this Report and Recommendation.

## VIII.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from entry of this Report and Recommendation to file written objections.  *See* FED. R. CIV. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joanna Seybert.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

SO ORDERED.

Dated: Central Islip, New York
August 11, 2020                                    /s/ A. Kathleen Tomlinson
                                                         A. KATHLEEN TOMLINSON
                                                         U.S. Magistrate Judge

48